# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1170

MANU PATEL, et al.,

*Plaintiffs-Appellants,*

v.

CITY OF CHICAGO, et al.

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 1174—**Wayne R. Andersen**, *Judge.*

———————

ARGUED OCTOBER 30, 2003—DECIDED SEPTEMBER 7, 2004

———————


Before RIPPLE, MANION, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Manu Patel, Chanchal Patel, and Mukti Enterprises, Inc. ("the Plaintiffs") own eleven motels on Chicago's far north side. After the Chicago City Council passed an ordinance designating the area surrounding the motels as a redevelopment zone and identifying the motels as potential targets for acquisition through eminent domain, the Plaintiffs filed suit against the City of Chicago, Mayor Richard M. Daley, and Alderman Patrick J. O'Connor ("the Defendants"). The Plaintiffs allege that the City's placement of their properties on this acquisi-

tion list was arbitrary and thus violates the equal protection clause of the Fourteenth Amendment to the U.S. Constitution. After deciding that the Plaintiffs' claim was not ripe for review in federal court, the district court granted the Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). We hold that the Plaintiffs' claim, whether labeled an equal protection claim or a takings claim, is subject to the special ripeness standards for constitutional property rights claims established in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985). Because the Plaintiffs have not yet satisfied those standards, we affirm.

# I

On November 3, 1999, the Chicago City Council passed an ordinance entitled, "Authorization for Approval of Tax Increment Development Plan for Lincoln Avenue Redevelopment Project Area" ("the Ordinance"). Pursuant to the Illinois Tax Increment Allocation Redevelopment Act, 65 ILCS 5/11-74.4-1 *et seq.*, the Ordinance authorizes the use of tax increment financing to fund the redevelopment of an area on the City of Chicago's far north side. In passing the ordinance, the City Council made the finding that the Redevelopment Project Area "on the whole has not been subject to growth and development through investment by private enterprise and would not reasonably be expected to be developed without the adoption of the Plan." The Ordinance specifically provides:

> In compliance with Section 5/11-74.4-4(c) of the Act and with the Plan, the Corporation Council is authorized to negotiate for the acquisition by the City of parcels contained within the Area. In the event the Corporation Counsel is unable to acquire any of said parcels through negotiation, the Corporation Counsel is authorized to institute eminent domain proceedings to acquire such parcels.

The Ordinance incorporates Map 4, the "Acquisition Map," which indicates "the parcels currently authorized to be acquired for clearance and redevelopment in the Redevelopment Project Area," and Exhibit 3, entitled, "Acquisition by Block and Parcel Identification Number."

The Lincoln Avenue Redevelopment Project Area includes a range of businesses in various states of repair and disrepair, but the Ordinance's acquisition map identified only the Plaintiffs' eleven motel properties as pre-authorized for acquisition. According to the Plaintiffs, their motels "are not in a deteriorated condition, do not have obsolescence, excessive land coverage or other blighting characteristics, and, in fact, are in much better condition than many structures in the Project Area." The City sees matters differently. It has said that "the environment of some businesses along Lincoln Avenue, especially the motels, is characterized by transient, 24-hour traffic along alleys abutting residential uses, inefficient ingress and egress, and a lack of upkeep." Likewise, the press has reported that Mayor Daley has described the motels as "hotbeds—if you'll excuse the term— of drugs and prostitution." David Roeder, *Developers plot the end of Lincoln Ave. vice strip*, CHI. SUN-TIMES, Sept. 11, 2002, at 53.

In February 2001, the Plaintiffs filed a three-count complaint. Count I alleged that the City and Mayor Daley violated the Plaintiffs' right to equal protection under the Fourteenth Amendment by enacting an ordinance that authorized the City to institute eminent domain proceedings against the motels; Count II charged the City and Alderman O'Connor with violating the Plaintiffs' rights under the Illinois Constitution by threatening to use the City's eminent domain authority in bad faith; and Count III alleged that the Defendants wrongfully attempted an inverse condemnation of the motels, also in violation of the Illinois Constitution. At the time the Plaintiffs filed suit, the City had not appropriated funds to acquire their properties nor had it initiated

condemnation proceedings against them. On this basis, Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). On March 25, 2002, the court granted the Defendants' motion under Rule 12(b)(1) on the grounds that the Plaintiffs lacked standing to file suit and that their claim was not yet ripe for review. Having found that it lacked subject matter jurisdiction to hear the Plaintiffs' equal protection claim, the court then dismissed the Plaintiffs' supplemental state law claims. Later, the district court granted the Plaintiffs' motion to vacate the judgment and for leave to file an amended complaint, but on December 20, 2002, the court again granted the Defendants' motion to dismiss pursuant to Rule 12(b)(1). The Plaintiffs then appealed.

Since the Plaintiffs filed their appeal, there have been several developments relevant to this case of which we take note. Most significantly, the Ordinance's pre-authorization of the Plaintiffs' motels as potential targets for eminent domain proceedings has expired. With respect to the Plaintiffs' properties, the Ordinance stipulates:

> [T]he acquisition of occupied properties by the City shall commence within four years from the date of the publication of the ordinance approving the Plan. Acquisition shall be deemed to have commenced with the sending of an offer letter. After the expiration of this four-year period, the City may acquire such property pursuant to this Plan under the Act according to its customary procedures.

The Ordinance was published on November 10, 1999, see 1 Journal of the Proceedings of the City Council of the City of Chicago, Illinois, Nov. 10, 1999, at 14777, causing it to expire on November 10, 2003, shortly after we heard argument in this case. In response to our request for a status report regarding whether the City had re-authorized the Ordinance, the City filed a statement on November 7, 2003,

confirming that the Ordinance "will expire in a matter of days" and reporting that it "has plans to pursue the acquisition of two of the plaintiffs' motels, the Lincoln Motel and the Patio Motel. With respect to the other nine motels, the City has not made the decision to proceed with acquisition." The City also acknowledged that "as to the Lincoln and Patio Motels, after November 10, 2003, the City may only acquire these properties if it follows its customary procedures. These procedures include seeking a recommendation from the Community Development Commission to the City Council, and obtaining the passage of an ordinance approving the acquisitions by the City Council." Subsequently, in March 2004, the Plaintiffs filed a motion to supplement the record, which included letters from the City offering to purchase two of their properties and indicating its intention to commence eminent domain proceedings if they declined its offer.

## B

We review *de novo* the district court's grant of a motion to dismiss under Rule 12(b)(1). *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 521 (7th Cir. 2001), *cert. denied*, 535 U.S. 929 (2002). In doing so, "[w]e accept all of the well-pleaded factual allegations in the plaintiff's complaint as true and draw all reasonable inferences in favor of the plaintiff. We shall affirm the district court's dismissal of the complaint only if it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle it to relief." *Id.* (internal citations omitted).

The Plaintiffs have attempted to state an equal protection claim arising from the Defendants' decision to target their properties for eminent domain proceedings merely by including them in the Ordinance's acquisition list and map. Specifically, they allege that "the Ordinance states no rational reason to single out for acquisition by the City

through eminent domain or by other means the parcels on which the Motels are located. The designation of such parcels for acquisition is arbitrary and capricious and exhibits an *animus* by defendants towards plaintiffs." It therefore appears that they are not claiming that they have been singled out as "members of a vulnerable group, racial or otherwise, for unequal treatment." *Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995). Instead, they appear to be claiming that the Ordinance is a law that rests on wholly irrational distinctions, presumably between their properties and all others in the City. See *id.* (noting that this theory rarely succeeds). Or, they may in part be trying to assert the type of equal protection claim that arises when a party is subject to "a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." *Id.* at 180 (providing the example of "an ordinance saying: 'No one whose last name begins with 'F' may use a portable sign in front of a 24-hour food shop, but everyone else may.'" (internal citation and quotation marks omitted). We have commented that this third theory "provide[s] a kind of last-ditch protection against governmental action wholly impossible to relate to legitimate governmental objectives." *Id.* at 180.

Regardless of the precise nature of the attempted equal protection claim, our review at this stage of the case is limited to the question whether the requirements of Article III of the Constitution have been satisfied—in particular, whether the claim is ripe for our review. The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Sprint Spectrum L.P. v. City of Carmel*, 361 F.3d 998, 1002 (7th Cir. 2004) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)) (internal quotation marks omitted).

In *Williamson County*, "the Supreme Court articulated a special ripeness doctrine for constitutional property rights claims which preclude[s] federal courts from adjudicating land use disputes until: (1) the regulatory agency has had an opportunity to make a considered definitive decision, and (2) the property owner exhausts available state remedies for compensation." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). *Williamson County* explains that "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." 473 U.S. at 194. Therefore, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195. "We have subject matter jurisdiction over only those takings claims for which the *Williamson County* requirements are satisfied or otherwise excused." *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 957-58 (7th Cir. 2004).

As a preliminary matter, we must decide whether *Williamson County*'s special ripeness requirements apply in this case. The Plaintiffs insist that they do not because theirs is an equal protection claim, not a takings claim. While "[t]his Circuit has read *Williamson* broadly, rejecting attempts to label 'takings' claims as 'equal protection' claims and thus requiring 'ripeness,'" we have also recognized that "*bona fide* equal protection claims arising from land-use decisions can be made independently from a takings claim and without being subject to *Williamson* ripeness." *Forseth*, 199 F.3d at 370. "Absent a fundamental right or a suspect class, to demonstrate a viable equal protection claim in the land-use context, the plaintiff must demonstrate 'governmental action wholly impossible to relate to legitimate governmental objectives.'" *Id.* at 370-71 (quoting *Esmail*, 53 F.3d at 180). This standard is "satisfied when the equal protection claim [is] based on: (1) the malicious conduct of a governmental agent, in other words, conduct that evidences a

spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective; or (2) circumstances, such as prayer for equitable relief and a claim [that] would evaporate if the [governmental body] treated everyone equally, that sufficiently suggest that the plaintiff has not raised just a single takings claim with different disguises." *Id.* at 371 (internal citations and quotation marks omitted).

Applying this standard, we conclude that the Plaintiffs' have merely re-labeled their takings claim as an equal protection claim, presumably to avoid *Williamson County*'s ripeness requirement. The Plaintiffs' first amended complaint makes clear that their equal protection claim is *not* based on membership in a protected class, which would render *Williamson County*'s ripeness requirements inapplicable. See *id.* at 370. Rather, the Plaintiffs' characterization of both the injury they have allegedly suffered and the relief they seek places their claim squarely within the rubric of a takings claim and the coverage of *Williamson County*. In their first amended complaint, the Plaintiffs assert that they have been injured because "[t]he threat of eminent domain and the conduct of defendants . . . depresses the value of the motel properties and discourages upgrading of the properties and other similar acts." We have explained that "[i]f plaintiffs' only real claim [i]s that [the governmental entity] has rendered their businesses worthless, then pursuant to the rule of *Williamson County* they must go to state court . . . because their claim was truly (and solely) one for a taking." *Hager v. City of West Peoria*, 84 F.3d 865, 870 (7th Cir. 1996).

Furthermore, the Plaintiffs seek relief in the form of a declaration "that the eminent domain provisions of the TIF Ordinance are unconstitutional and invalid as to them and the properties on which the Motels are located" and an injunction barring the City from enforcing its eminent domain powers against the Plaintiffs' properties. This is precisely the kind of relief that *Williamson County* prohibits,

recognizing that the federal courts' role is not to enjoin localities from exercising their eminent domain powers, but to ensure that property owners are justly compensated when localities exercise that power. See *Williamson County*, 473 U.S. at 194 (observing that the Constitution does not "require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a 'reasonable, certain and adequate provisions for obtaining compensation' exist at the time of the taking." (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 124-25 (1974))). Indeed, to grant such injunctive relief to all targets of eminent domain proceedings who recast their takings claims as equal protection claims would render *Williamson County*'s holding nugatory. See *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir. 1994) ("Labels do not matter. A person contending that state or local regulation of the use of land has gone overboard must repair to state court.").

Having found the Plaintiffs' claim governed by *Williamson County*, we readily conclude that it is not ripe under the standards established in that case. The City has not initiated eminent domain proceedings against the Plaintiffs' properties, let alone failed to provide just compensation for taking those properties. Hence, the Plaintiffs have suffered no injury under the Constitution. See *Williamson County*, 473 U.S. at 195. Moreover, we have specifically rejected takings claims, like the Plaintiffs', which allege injury arising from a property's placement on a list of potential targets for eminent domain proceedings. See, *e.g.*, *SGB Fin. Servs., Inc. v. Consolidated City of Indianapolis-Marion County*, 235 F.3d 1036 (7th Cir. 2000). In *SGB*, the plaintiffs argued that Indianapolis effected a taking when it placed SGB's property on the city's "acquisition list" for an area that it declared blighted and suitable for redevelopment. *Id.* at 1037. SGB "offered to prove that it had become unable to sell the buildings at a profit, or borrow funds to improve

them, because potential buyers and lenders feared that Indianapolis would acquire the property at a low price." *Id.* We rejected this claim, observing that it "sounds like an argument that Indiana courts do not award full market value in condemnation proceedings, for it must be the anticipated buyout price rather than a property's simple presence on the list that affects how lenders and potential purchasers deal with owners in the meantime." *Id.* We further explained, "If the state pays full market price in the event of an acquisition, then buyers will be willing to pay the market price in prior transactions, and owners will make (and lenders will fund) all cost-justified improvements whether or not an acquisition occurs. If, on the other hand, state courts systematically award inadequate compensation, then prices of property will fall in anticipation, whether or not the property appears on a formal list." *Id.* We therefore concluded that, under the reasoning of *Williamson County*, SGB had to seek compensation through a state inverse condemnation claim before it could bring suit in federal court. *Id.* at 1039.

Because the Plaintiffs have suffered no injury and will only do so if and when the City fails to compensate them justly for their properties, their claim is not ripe for review. For this reason, we need not consider the Plaintiffs' motion to supplement the record, which included letters from the City to the Plaintiffs indicating its intention to commence eminent domain proceedings with respect to two of the motel properties if the Plaintiffs decline the City's offer to pay the properties' market value. These letters do not alter our ripeness analysis, as under *Williamson County* only documentation showing that the Plaintiffs had unsuccessfully attempted to obtain just compensation through the procedures provided by the state for obtaining such compensation would allow us to exercise jurisdiction over the Plaintiffs' claim. Thus, our analysis is unaffected by the contents of the Plaintiffs' motion and the enclosed letters.

### III

For these reasons, we AFFIRM the district court's judgment granting the Defendants' motion to dismiss.


A true Copy:

Teste:


_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*